# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* H. E. REYNOLDS, Minor.

UNPUBLISHED
September 13, 2018

Nos. 341301; 341302
Ingham Circuit Court
Family Division
LC No.   15-001059-NA

Before:  METER, P.J., and K. F. KELLY and GLEICHER, JJ.

PER CURIAM.

The circuit court terminated the parental rights of both respondent-parents to their young son, HER, pursuant to MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (g), based on continuing drug abuse and domestic violence in their home.  Although respondents actively participated in services and made progress at times, they slid backward on the eve of the termination hearing, evidencing that they would be unable to provide a safe home for their child within a reasonable time.  We affirm.

## I.  BACKGROUND

HER was born on August 11, 2015, suffering from drug withdrawal symptoms that required morphine treatments.  His parents were not young—respondent-mother was 36 and respondent-father was 43.  Mother had a history of mental illness, including anxiety, bipolar disorder, ADHD, anorexia and bulimia.  She had previously been prescribed Adderall, Xanax, and Norco and continued to secure these substances without prescriptions, and misused them throughout her pregnancy and the proceedings.  Father abused alcohol and was physically and emotionally abusive of mother.  Shortly before HER was born, mother tried to leave father and father held her captive.  When the Child Protective Services (CPS) investigator interviewed mother shortly after HER's birth, mother had a bruise on the side of her face.  To their credit, respondents lived in a suitable apartment (with rent subsidized by mother's parents) and they had income—father worked as a cook and mother received disability benefits.

CPS took HER into care immediately upon his release from the hospital and placed him with respondent-mother's mother and stepfather, Jean and Robert Ramsey.  Unfortunately, the Ramseys harbored no expectation that their adult daughter would quickly overcome her substance abuse and psychological issues and regain custody of her child.  The Ramseys did not like respondent-father and had apparently grown weary of assisting respondent-mother.  They secured counsel and fought to end respondents' unsupervised parenting time, in part because respondents smoked cigarettes around infant HER and he fell ill with a series of respiratory

-1-

infections. Respondents were otherwise appropriate during parenting time and provided for all of HER's needs.

Initially, respondents made progress during the proceedings. Respondents participated in counseling and father seemed to overcome his anger management issues. Father's alcohol and drug screens were clean. However, mother continued to use medications without valid prescriptions. She gave birth to a second child in August 2017, HR, who was also addicted to drugs. The Ramseys took that child into care as well. The cost of services became overwhelming and respondents had to stop counseling because of outstanding bills. Finally, respondents were evicted from their apartment, in part because the Ramseys stopped subsidizing their rent and in part because respondents brought a bedbug infestation to the building.

Respondents secured a new apartment and were in the process of unpacking and preparing for their children's return. But then father tested positive for amphetamines and opioids and he tried to blame the result on over-the-counter cold medication. On the eve of the termination hearing, mother texted a worker with the Early On infant/toddler development program that father had become irate and smashed a dollhouse she had brought into the apartment. Mother indicated that she needed to end her relationship with father because he was "out of control" and "physically abusive." Mother tried to recant this story at the hearing, claiming that father was not "physically" abusive and that the pair had simply had a heated argument about her bringing additional clutter into the home. Adding to their troubles, respondents were fighting eviction proceedings at their new apartment as well.

The resurgence of drug use, domestic violence, and financial woes led the Department of Health and Human Services (DHHS) to pursue termination in an amended petition on September 7, 2017. Before terminating respondents' parental rights, the court acknowledged that the tense relationship between the Ramseys and respondents "stood in the way at times of reunification." The court also acknowledged the "very strong" bond respondents had with HER. However, the court noted, HER had been in care for 26 months by the time the court issued its termination order, a long time for respondents to be experiencing set-backs involving the issues that had brought HER into care. The court cited the caseworker's disbelief of father's excuse for his recent positive drug screen and mother's continued use of medications despite that she did not secure prescriptions until August 2017. The foster case manager found respondents' new apartment to be unsuitable for placement because it was cluttered and because respondents were not emotionally ready to provide a permanent and stable home. The court further noted that "[t]he issue of domestic violence between the parents seems to still exist."

Ultimately the court ruled:

It is very hard to overlook the extensive time this child has been in foster care and the Court is of the opinion that the child does need stability and permanence in his li[f]e. Though the parents have shown flashes of ability to parent the child, it has taken them too long to do the things that need to be done, such as provide a stable home and financial security. The reason this case came to the Court is still in existence and there hasn't been sufficient progress to warrant the child being returned to the parents. This is highlighted by the fact that over this time the parents have not been able to graduate to unsupervised

visitation with their child.[1]  They can't seem to put the needs of the child first before their own.  It is clear to the Court that the best interest of the child is served by giving him permanence and stability.  This Court is of the opinion that by clear and convincing evidence the statutory bases cited above [MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (g)] have been shown.

Respondents both appealed the circuit court's order and this Court consolidated their appeals for joint consideration.

## II. STATUTORY GROUNDS

On appeal, respondents challenge the evidence supporting the statutory grounds underlying the circuit court's termination decision.  Pursuant to MCL 712A.19b(3), a circuit court "may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence" that at least one statutory ground has been proven by the DHHS.  MCR 3.977(A)(3); *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000).  When termination is sought in a supplemental petition based on new grounds, the DHHS must present legally admissible evidence in support.  *In re DMK*, 289 Mich App 246, 258; 796 NW2d 129 (2010).  We review a circuit court's factual finding that a statutory termination ground has been established for clear error.  *In re Rood*, 483 Mich 73, 90-91; 763 NW2d 587 (2009).  "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses."  *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (quotation marks and citation omitted).  "Clear error signifies a decision that strikes us as more than just maybe or probably wrong."  *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

In this case, the circuit court terminated respondents' parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (g), which provided:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c)  The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*)  The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

---

[1] Respondents actually had been granted unsupervised parenting time earlier in the proceedings, but that privilege had been revoked.

(*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

\* \* \*

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[2]

The DHHS established that respondents had not rectified the conditions that led to adjudication, warranting termination of their parental rights more than two years after their son was taken into protective care. The court adjudicated respondent-father unfit after a jury trial because his "home or environment by reason of neglect, drunkenness or criminality . . . is an unfit place for [the child] to live in." Although father had seemingly ceased using alcohol, he tested positive for amphetamines and Oxycodone on August 19, 2017. The court adjudicated mother unfit based on her plea of domestic violence in the home and her misuse of medications, and because HER was born with illegal substances in his system. Mother continued to misuse medications without a prescription throughout the proceedings, culminating in a second child being born addicted to drugs in August 2017. Based on this evidence, neither parent had rectified the conditions that led to adjudication. Furthermore, given mother's failure to overcome her substance abuse after two years of services and father's sudden reversion after such extensive services, the court did not clearly err in finding that respondents would be unable to rectify these conditions within a reasonable time, supporting termination under factor (c)(*i*).

The DHHS further established other conditions arising after jurisdiction was taken that had not been remedied despite the provision of services. As noted, mother pleaded to domestic violence in the home, although the jury did not specifically find domestic violence as a ground to take jurisdiction over HER as to father. Accordingly, we consider domestic violence as an additional ground arising after the court took jurisdiction. The court ordered respondents to participate in services to resolve the domestic violence issues in their home. Both parties attended counseling, individually and as a couple. But again on the eve of the termination trial, father became irate when mother brought her childhood dollhouse into their apartment. Father

---

[2] The Legislature amended factor (g) in 2018 PA 58, effective June 12, 2018. It now provides:

The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

-4-

apparently became violent in his verbal assault of mother and smashed the dollhouse. Mother was fearful enough to message the Early On worker that she intended to leave father. By the time of the termination hearing, however, mother had minimized the incident and wanted to continue her relationship with father.

Through this evidence, the DHHS established that father had not overcome his anger management issues and poses a threat of physical violence to mother and potentially their children. And the DHHS demonstrated that despite significant counseling, mother still is unwilling to protect herself, potentially placing her children in harm's way.

Additional support for termination under factor (c)(*ii*) is provided by respondents' ever increasing financial instability. When the proceedings began, respondents were living in a suitable apartment only because the Ramseys subsidized their rent. Burdened by caring for first one and then two babies, the Ramseys stopped making these rent payments. Respondents found a new, cheaper apartment but were being evicted from that home as well by the time of the termination hearing. Father continued working and mother continued collecting Social Security Disability benefits, but respondents claimed that their former landlord wanted $3,000 to reimburse him for bedbug fumigation, father had lost money in selling a fire-damaged house, father's paychecks were being garnished to pay off student loans, and respondents' medical bills were accumulating. Again, respondents are not young parents. Their increasing financial instability this late in the proceedings is a barrier to their ability to provide for their children, but is also evidence of their underlying emotional instability. Given this record, we find no error in the circuit court's termination of respondents' parental rights under factor (c)(*ii*).

Mother argues that the DHHS could not support termination under factors (c)(*i*) and (*ii*) because it failed to make reasonable efforts at reunification. In this regard, mother contends that the DHHS acquiesced in the Ramseys' plan to terminate her parental rights from the beginning of the proceedings and therefore did not expend sufficient energy on this matter. Mother emphasizes that the Ramseys cancelled so many visits because of HER's alleged illnesses that the caseworker required them to provide doctor notes, that the staff at HER's pediatrician office treated her with hostility because of her parents' subversive efforts, and that one caseworker was inundated with up to five emails a day from the Ramseys, all trying to sway the caseworkers in favor of premature termination of respondents' parental rights.

Although the Ramseys urged termination from the start, the DHHS did not fail in its duty to provide reunification services. The DHHS provided counseling and education services to both respondents throughout the proceedings. When the Ramseys attempted to limit parenting time sessions, the DHHS stepped in and required them to provide doctor notes before cancelling visits. The DHHS workers did not recommend termination because of the volume of complaints and communications received from the Ramseys. Rather, the caseworker had been on the verge of recommending returning HER into respondents' care when father tested positive for narcotics, mother's second child was born with drugs in his system, and father became irate at mother and smashed her personal property. The DHHS could not order the Ramseys to continue subsidizing mother's income and there is no record indication that respondents have any other plan to rectify their financial instability. Ultimately, although the Ramseys acted improperly, their conduct did not alter the outcome of these proceedings.

As termination was supported under factors (c)(*i*) and (c)(*ii*), we need not consider the propriety of terminating respondents' parental rights under factor (g).

## III. BEST INTERESTS

Respondents further contend that termination of their parental rights was not in HER's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *Moss*, 301 Mich App at 90. The court should weigh all the evidence available to it in determining the child's best interests. *Trejo*, 462 Mich at 356-357. Relevant factors include "the child's bond to the parent, the parent's parenting ability, [and] the child's need for permanency, stability, and finality. . . ." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider . . . the parent's compliance with his or her case service plan, the parent's visitation history with the child, [and] the children's well-being while in care. . . ." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). The advantages of the child's foster placement over placement with the parent are a relevant consideration. *In re Foster*, 285 Mich App 630, 634-635; 776 NW2d 415 (2009). However, a child's placement with relatives weighs against termination, MCL 712A.19a(6)(a), and the court must expressly consider the child's relative placement in making its best-interest determination. *Olive/Metts*, 297 Mich App at 43.

Mother accuses the court of failing to expressly consider HER's placement with relatives when determining whether termination of respondents' parental rights was in the child's best interests. This is a mischaracterization of the record. In fact, the court stated:

> The foster parents in this case are the mother and step-father of the respondent mother. The caseworker indicated that the foster parents were not supportive of reunification and that there was constant bickering between the parents and the foster parents. I point this out only because there is some indication that the difference between the foster parents and the birth parents stood in the way at times of reunification.

The reason that relative placement weighs against termination is because the child's parents usually can maintain some sort of relationship with the child while in the relative's care. Although parent and child will not live in the same house, they will remain in each other's family circle and can share time together. This is not such a case. The Ramseys have unequivocally stated that they want nothing to do with respondent-father. The Ramseys have also stopped assisting respondent-mother and instead are placing their young grandchildren's needs above those of their grown daughter. The tension between the Ramseys and respondents is high, making any type of shared family experience impossible.

Respondents further contend that the circuit court failed to properly weigh the other factors impacting HER's best interests. Respondents cite HER's strong bond with them as weighing in favor of retaining their parental rights. Again, the court considered this factor, describing, "The bond between the child and the parents appears to be very strong." The court

-6-

weighed this bond against other factors favoring termination. Specifically, the court noted that "there were still concerns with the father's anger" and that HER had never been in his parents' care. The court further noted the length of time HER had been in care, then more than two years. The only home HER had ever known was with the Ramseys. They provided HER permanence and stability. Respondents, on the other hand, were still unable to provide a home for HER despite more than two years of services. We do not doubt that respondents love HER and want to care for him. However, the record evidence supports the court's conclusion that termination was in the child's best interest.

We affirm.


/s/ Patrick M. Meter
/s/ Kirsten Frank Kelly
/s/ Elizabeth L. Gleicher